Johns and another, Appellants, vs. City of Platteville,
Respondent.

*April 13—May 2, 1916.*

*Municipal corporations: Sewerage system: Nuisance: Fouling of wa-
tercourse: Rights of riparian owners.*

1. Legislative authority to install a sewerage system gives a city no
   right to create or maintain a nuisance, whether such nuisance
   results from negligence or from the plan adopted.
2. A city has no right to discharge sewage into a watercourse in such
   a way as to infringe upon the rights of riparian owners to the
   natural flow of water substantially unimpaired in volume and
   purity.
3. Findings by the trial court in this case, to the effect that the de-
   fendant city properly treated and purified its sewage in septic
   tanks and that the effluent did not render the waters of the creek
   in question, which flowed over plaintiffs' land, foul, contami-
   nated, impure, or unfit to be drunk by domestic animals, and
   hence that there was no nuisance, are *held* to be contrary to the
   great preponderance of the evidence.

APPEAL from a judgment of the circuit court for Grant
county: GEORGE CLEMENTSON, Circuit Judge. *Reversed.*

Action for damages to enjoin the maintenance of a nui-
sance. The facts are: The defendant city disposes of its sew-
age by treating the same in septic tanks. Tank number one
is located some distance from plaintiffs' land, and the water
discharged from the tank, referred to as the effluent, is con-
ducted through a pipe to a point on the public highway near
plaintiffs' property and there discharged into Rountree
branch, a small creek which flows southerly from the place of
discharge over the plaintiffs' land. Plaintiffs claim that the
discharge from the tank renders the waters of the stream foul,
contaminated, impure, poisonous, not fit for domestic use or
to be drunk by animals of any kind; that the deposit from the
tank gives rise to noxious, unwholesome, poisonous smells and
stenches, causing great annoyance and discomfort to plaintiffs
and their families. Plaintiffs ask that the discharge of sew-

age in the manner alleged be declared to be a public nuisance and that it be declared to be a private nuisance and for damages and that the nuisance may be abated. The answer of the defendant city denies the principal allegations of plaintiffs' complaint, alleges that the effluent is not impure and that the stream is not contaminated and that no nuisance exists. The cause was tried before the court without a jury, and the court found upon all the issues in favor of the defendant and gave judgment directing that plaintiffs' complaint be dismissed, and from the judgment so entered plaintiffs appeal.

*Calvert Spensley,* for the appellants.

*R. A. Goodell,* attorney, and *J. W. Murphy,* of counsel, for the respondent.

ROSENBERRY, J. The sole question presented by this appeal is whether or not the evidence sustains the findings of the trial court. The law upon the right of a municipality to discharge sewage into a watercourse to the detriment of the lower riparian owner is fully stated in the case of *Winchell v. Waukesha,* 110 Wis. 101, 108, 85 N. W. 668, where the court said:

"The right of the riparian owner to the natural flow of water substantially unimpaired in volume and purity is one of great value, and which the law nowhere has more persistently recognized and jealously protected than in Wisconsin. Not alone the strictly private right, but important public interests, would be seriously jeopardized by promiscuous pollution of our streams and lakes. Considerations of æsthetic attractiveness, industrial utility, and public health and comfort are involved. . . . The great weight of authority, American and English, supports the view that legislative authority to install a sewer system carries no implication of authority to create or maintain a nuisance, and that it matters not whether such nuisance results from negligence or from the plan adopted. If such nuisance be created, the same remedies may be invoked as if the proprietor were an individual."

The court found that the system adopted by the defendant city for the disposition of its sewage was one properly adapted

to that purpose; that it was properly designed and constructed and was adequate to take care of and purify the sewage passing through the sewer pipes of the sewerage district connected with the tank in question; and the court further found that the tank in question properly digested and rendered harmless the sewage; that the defendant had not during the time complained of permitted any imperfectly digested sewage to pass through the pipe; that no sewage had impregnated the air over and upon plaintiffs' land or upon the lands in the vicinity thereof with unwholesome, injurious, or poisonous smells or fumes, and that the sewage was properly purified; that no material or substantial part of the sewage passed into the waters of the branch in question so as to render such water foul, contaminated, impure, or unfit to be drunk by domestic animals. From the findings of the court there followed the necessary conclusion that no nuisance existed.

From the testimony it appears that the tank in question was constructed in 1907 easterly from the point where it is now discharged into Rountree branch several hundred feet; that at the time of its erection a pipe extended from the tank directly into Rountree branch; that in the year 1911 one Caroline Stender, an upper riparian owner, complained of the condition of the stream and brought suit against the defendant city asking to have the tank declared a nuisance both as to herself and as to the public. This suit was settled by an agreement under which the city paid a sum of money and constructed a pipe across the lands of Caroline Stender and several hundred feet down stream to the point where the effluent is now discharged.

It further appears from the testimony of Mr. Tully, an expert, that the sewage is treated solely by the action of bacteria. The sewage is first discharged into the septic tank, where it is attacked by a specific type of bacteria which causes its liquefaction. The bacteria grow and cultivate without oxygen, and in their endeavor to obtain energy for their activi-

ties they decompose the sludge or solid matter which is on the bottom of the tank and liquefy it into decomposition products, one of the characteristics of the products being their solubility, so that the entire sewage matter coming into the tank is discharged into the stream, with the exception of a comparatively small amount of solid matter which is insoluble and which is deposited mainly upon the floor of the tank and hauled away from time to time. If, however, the quantity of sewage is too large or the contents of the tank are stirred up, a certain amount of undigested sludge or solid matter will be carried off; that "it is inevitable that some finely divided suspended material must be discharged from every septic tank which is properly working." The main question litigated upon the trial was whether or not there was such a quantity of this undigested sewage discharged into Rountree branch and carried thence upon the lands of plaintiffs as would constitute a nuisance. The testimony of the plaintiffs' witnesses was to the effect that the water discharged from the pipe near the bridge was dark, looked black, smelled very bad, was stringy and dirty, and was unfit for domestic animals to drink; that the smell from the tank was offensive, the water was thick, and that it was so offensive at one time that men washing slag in the stream about 100 feet below were sick to their stomachs and could not eat, they were unable to stand the smell until cooler weather; that persons passing over the bridge noticed the odor, and that it was very bad excepting in wintertime or cool weather. The road overseer testified that he had observed the discharge from the pipe; that it was dark, slimy and offensive, and was discolored; that in 1913, while working on the bridge, a rail was dropped into the water and when removed one could hardly touch it, that it smelled and the hands and clothing smelled after coming in contact with it. Another witness testified that he got some water out of the creek to throw over his hogs; that from the half pail of water he got he could smell it all the way to town; that the odors were very offensive in warm weather. Without further

reviewing the evidence, plaintiffs' witnesses testified very fully to the facts stated.

The defendant produced two witnesses who own land adjoining the stream below the *Johns* lands. These witnesses testified that they had no trouble upon their premises; that there was no odor, and that they had not noticed that the water was contaminated. It appeared, however, that before the stream reached their premises its volume was nearly doubled by water flowing from a spring. The third witness produced for the defendant testified as to the amount of damages, but did not deny the testimony offered on behalf of the plaintiffs as to the character of the discharge below the mouth of the pipe, except to say that he had never noticed any smell from the Rountree branch on the *Johns* or Carthew lands.

The trial court apparently adopted the findings of Mr. Tully, the expert, *in toto,* giving little or no weight or effect to the testimony of the plaintiffs' witnesses. We have carefully examined the evidence given by Mr. Tully, and from such examination we are of the opinion that it does not in any material aspect of the case contradict the testimony of plaintiffs' witnesses, and, unless it does so, their testimony stands practically uncontradicted in the case. Mr. Tully was a fair, frank witness. He examined the stream on two different occasions, once between the 9th and the 14th of October, 1914, and the second time in the month of November, 1914, at or shortly before the time of the trial. He does not say or pretend to say what the condition of the stream was during the summer months, and bases his conclusions entirely upon a bacteriological examination of the effluent and the water found in the stream upon the occasion of his visits to the stream at the times stated. He testified that it is practically impossible to have a septic tank and thus to purify sewage without having a stream somewhat polluted where the septic tank enters into it; by pollution, meaning bacterial pollution. He was asked this question: "From what you have determined of the character of the water, was it water that cattle

could drink, as it ran through *Mr. Johns's* land, without injury?" And he answered: "I should not think that a more or less continuous use of the water for the purpose of watering cattle would be specifically injurious." He further stated that he would object to the use of milk from such cattle unless he knew that the teats and bags of the animals had been thoroughly cleaned; that the use of any stream which is polluted to any considerable degree is to be deprecated for the use of cattle.

From Mr. Tully's testimony it appears that the discharge of sewage into a stream may result in the production of a nuisance principally in three ways; these may appear separately or may be in combination: (1) The mingling of undigested sewage with the waters of the stream; (2) the deposit of undigested sewage on the bed and banks of the stream; (3) bacterial pollution.

In order to properly dispose of the sewage it appears that two factors must combine. There must be a septic tank of sufficient capacity to permit the completion of the bacteriological process before the sewage effluent passes over the weir of the tank and into the discharge pipe; and second, the process must be properly carried on, that is, the tank must not be overloaded, the tank contents must not be stirred up. It further appeared that, in addition to the methods provided for the discharge of the sewage from one compartment to another in the tank, holes had been cut leading from one compartment to another so that more sewage could be passed through the tank and its capacity thereby increased. The conditions described by plaintiffs' witnesses may be the result of crowding the tank beyond its capacity; may be due to the fact that the holes cut leading from one compartment to another permit the passage of undigested matter.

Mr. Tully testified very fully as to the results of the examination made by him from the samples of water taken. But from this testimony it appears that they were satisfactory from a bacteriological standpoint as of the date when the

samples were taken. There is not a syllable of testimony in the case to show that the effluent was in the same condition at the times referred to by plaintiffs' witnesses as at the time of the taking of the samples. Mr. Tully testified that at the time of his inspection there were no deposits of objectionable character on the bed or banks of the stream. There was no testimony offered by the defendant tending to show a regularity of sewage flow. Mr. Tully based his observations in that respect wholly upon an estimate. There was testimony on the part of the plaintiffs tending to show that a very much larger amount of water was used during the warm summer months than at other times. While there is some testimony on the part of the plaintiffs tending to show that the condition was bad continuously, it is undisputed that it was much worse in the summer months than at other times. It seems remarkable, if the fact is as claimed by the defendant that no nuisance exists, that no witnesses were produced by the defendant to prove the actual state of the stream at the times especially complained of, instead of relying entirely upon a scientific examination of samples taken in the months of October and November, to establish by inference the condition of the stream some months and years prior thereto.

Giving to the testimony of Mr. Tully all the force and effect that can fairly be claimed for it, it does not fairly contradict the testimony of plaintiffs' witnesses, for the testimony of both may be entirely true. Assuming the testimony of plaintiffs' witnesses to be true, as we are bound to do, it being practically uncontradicted in the case, the findings of the trial court are manifestly against the great preponderance of the evidence and the plaintiffs are entitled to the relief prayed for in the complaint.

*By the Court.*—Judgment reversed, and cause remanded for further proceedings in accordance with this opinion, the circuit court to assess damages upon this record or take further testimony upon that point, as it may determine.